071798 Statewide Insurance Company v. Houston General Insurance Company Justices, Patrick Brady, on behalf of the Appellant, Houston General Insurance Company, I would like to reserve three minutes for response to the cross appeal. It is also my intent to limit my remarks because of time to the duty to defend issues. I'll stand on my briefs as to the other issues, but of course if the Court would like to ask questions, I'm at the Court's disposal. Mr. Brady, I'd like to inform you as well as the Counsel for Statewide that we're going to proceed this way. You're going to have your portion of your 15 minutes reserved. You said three minutes for rebuttal. The Counsel will have his portion of his 15 minutes to respond to your opening, and then we're going to give him two or three minutes, depending on what he reserves, for a reply to the cross appeal. Okay. Thank you. The fundamental issue of this case is what determined the termination of the policy? Was it the cancellation request, policy release, or was it, in essence, the April 1st, 1998 facsimile? Do we really start there, or don't we start with what's the state of the law in Illinois regarding an insured when he has, or it has, a dispute with one of its insureds? What responsibility does that insurance company have to sort of resolve that in an efficient and reasonable manner? And, of course, that is by filing suit. I think the prudent approach is that when there is a dispute as to coverage, that the insurance company filed that action and resolved the matter. And are there consequences to not filing? Absolutely. If not filing, and ultimately the court makes a determination that there is a duty to defend, the insurance company loses its policy defenses that it may have otherwise been able to assert, and it is also subject to 155 fees and costs. However, an insurance company that sits on its hands and does nothing and was right, there is no duty to defend. The risk of that happening would, in my mind, require me as a coverage attorney to always recommend that my clients file that action. But I think that is the state of the law as we now have it in this state. And I think in this particular case, what we have is a, with all due respect to the trial court, I think they applied the improper analysis on this case. The proper analysis would have been a combination of air safety, the Eken Green and St. Paul v. Armour's analysis taken together required the trial court to limit its analysis on the terminating date of the policy to the language and terms in the policy. And, of course, the St. Paul case would have, in effect, incorporated the cancellation request into the policy and made them part of the policy requiring that they be also considered in determining the date. Let me ask you regarding those cases you just set out. Do any of those cases involve an agent for the insurance company that deals with the notice of cancellation and thereafter acts on behalf of the insurance company contrary to the position that the insurance company takes subsequently? No, they do not, Your Honor. And that's what makes this case different, doesn't it? It makes it very interesting, but I still contend, Your Honor, that had we gone through the proper analysis, we would then have concluded that based on the cancellation request that the parties agreed that the commercial multi-parole policy was to terminate on November 15th. Now, if the insurer wanted to, after requesting the change in the policy period, to terminate the policy period, wanted to then extend the policy period, the policy provides provisions for that. The policy provides under the Common Policy Conditions section, subpart B, it says the insurer can request or make changes, but that Houston General must acquiesce to those changes and those changes must be made part of the policy through the endorsement process. That's on one end. Yes. That's on the part between the insurer and the insured. What sort of analysis or what sort of investigation did the insurance company undertake to determine what its agent did in the context of this case? If the Court recalls, the record indicates that we received notice, a fairly late notice on this, and at that point the insurance company's record reflected the cancellation of the policies, which is what was communicated then to, not the insurer, but was then communicated to attorneys for Statewide and Westfield. I think we have to bear in mind that the insurer was as in the dark about this lawsuit as we were. The insurer, nothing in the record suggests that the insurer herself made any specific representations concerning this policy. But you're not denying the existence of that September 13th or whatever that date is correspondence to? It's a November 13th. Before the 15th termination date, not contesting that. There's a November 10th request to rescind, on November 15th, but there's a November 13th request not to rescind the liability, the umbrella, and the auto policy. That is correct, and we acknowledge those. And that raises another point, because it seems as if Houston General did in fact act on that November 13th correspondence, because in fact the umbrella policy was reinstated or how would you characterize it? I mean, the umbrella policy came back to offer coverage without a gap. The reinstatement, if I may kind of back a little bit and work towards your answer, for the insurer to request of Midwest General, which was our agent at the time, reinstatement of be it the umbrella coverage, the auto, or the CMP policy, was the first correct first step in the process. The next step is Houston General must acquiesce to that request. The policy provision Why doesn't the agent bind Houston General if the agent has that sort of authority? Well, an agent doesn't have the authority. As the trial court read or wrote into its decision, and I can quote the language to you, and I want to do that to make sure I'm correct. The trial court, quoting from the agency agreement, said that the Midwest General had the authority to solicit and accept insurance proposals, investigate, rate, bind, and execute policies and policy cancellations. Nothing in that imbues in Midwest General the right to reinstate nor the right to rescind a cancellation. Well, let's say the agent got the 10th cancellation letter but didn't forward it to Houston General. I mean, is that a rescission? I mean, are we talking semantics? Are we talking how to characterize the agent's actions? I mean, what if we called this a binding? Let me try and answer three questions. First of all, rescission of the cancellation is just not provided for in the policy. It's just not something that can happen. Under these circumstances, once that policy period was changed to November 15th, if we wanted then to again change it, we have to go through the process outlined in subchapter B, request the change. Houston General will either accept or reject it, and if they accept it, they send an endorsement. If, however, we are talking about rescission, there it is. That's how you do it. So while the difference between rescission and reinstatement may seem picky, it's very precise because it means two very distinct ways about changing the policy. And again, we're talking about an integrated policy where extraneous or extrinsic evidence cannot be considered when determining the intent of the parties, and in this case, the intent of the parties as to the date the coverage terminates. You had one more question. I think I've lost it. I apologize. I did as well. But I was going back to your, you were going through the steps that You took with the umbrella, how it was reinstated. And I think that is a clear example of the way it should work. Is that the request was to reinstate. Houston General acquiesced to that request and issued an endorsement reinstating it back to the November 15 date. So at that point, do you think Houston General was obliged to explain why it didn't take on the very same action that was requested in the very same letter with regards to the other policy that was addressed in that very same letter? And they did. I'm sorry. I said there was I think two other policies. There's the other policy, which I believe was reinstated, but I don't think the record has, contains the endorsement. So I hesitate to travel down that road. But it did indicate why, and that is because an audit of the CMP policy was performed for one. And not really knowing because I wasn't there, I think it's not difficult to appreciate that possibly Houston General was not interested in reinstating a policy for which they are sending a refund. But again, I mean, we must look at the policy language that says Houston General must agree. The policy doesn't, aside from implicit in that policy is the good faith dealings with its insurer, it has the right to make a decision. A decision, your Justice, could have been we're no longer issuing that policy and we just want to get out of that business. Again, it's not a bad faith decision, but it's a decision that policy reserved to Houston General. The trial court did address that point, and didn't it say that in fact because the provision that you were saying was triggered was not in fact triggered because there was no, that provision addresses actual changes to the policy, maybe a broadening of the scope of the coverage or anything of the policy itself. And here nothing changed in terms of the liability part. Well, Your Honor, it's just not the terms and conditions of the liability coverage that creates the party's agreement in total. Integral to that agreement is the policy period. And as a young coverage attorney, I was beat with the concept that the first thing you do is look at the date of the accident and look at the policy period. And if the accident was outside the policy period, your coverage opinion is very short. So, I mean, yes, did it change? And I do take some exception to that. Yes, did it change the terms of coverage or how much coverage was? No, but it did nonetheless change a significant provision in that policy. I do believe that there was a change. That policy was sold and priced as a CMP or a commercial multi-parent policy. And by just finding that the liability policy was in effect, it changes the character of that policy. Probably that's important more to the pricing of the policy in terms of Houston General. But nonetheless, that changed the character of that policy. That was not a monoline policy. And certainly the option was available to the insured to go ahead with the canceling of the monoline and take, I mean, the multi-parent, take out a monoline policy. That certainly is an option. And would the agent at that point have been able to bind Houston General, if in fact that's what he decided? If the decision was made to allow and go to the monoline policy, the agent could have bound Houston General to the liability coverage for the period between the filing of the application and the decision by Houston General and the issuing of the policy. Once that policy is issued, and in fact all of the cases cited by counsel, with the exception of one, address this pre-issuing of the policy binding of coverage. One had to do with whether an agent like Midwest could be, whether the notice to that agent of the covered accident was binding on the insurance company. But nonetheless, those cases don't deal with what we have here. If I may just quickly address, I do believe that the facts of this case and the precedents set by our Supreme Court and Ekman, they require reversal and entry of judgment in favor of Houston General. In the alternative, I believe that there are numerous facts that create material issue that preclude the entry of summary judgment on, in favor of statewide, which at a minimum require reversing and remanding for further proceedings. And you're saying those questions of fact weren't resolved by whatever discovery material was before the court so that you need something, an evidentiary finding? Absolutely not. These facts were before the court. They were argued in my briefs. We, for example, and I'm not going to go through the whole list, but there was certain things. Mr. Marcos had a list of people that, a list of certificate holders that he indicated with his handwriting that he sent out notices on November 10th. He also indicated in the letter to Mr. Rouse that he was sending these notices out. When questioned during his deposition, he said, well, no, I never sent the notices out. Yet on November 12th, he sent a letter to all the certificate holders saying, oh, my letter of November 10th gave you the wrong date of termination. The correct date is. Well, if you never sent the notices out, why are you sending a letter? But that doesn't really turn anything in the case. He's not an agent of Houston General. No. Houston General's agent is what the focus was on, his action. But I think that focus was improper. I think the proper focus is what was the insurer's intent in terms of cancellation. The only thing we have. What if the judge says the only intent that I need to consider is that November 13th letter? I think that's improper based on the decisions in air supply and the other cases I've reported because we are dealing with an extrinsic evidence. And I know I'm getting close on my time, but I wish to make just two very quick points. Number one, neither statewide nor the trial court are challenging the sufficiency of the cancellation notices, nor that those cancellation notices were ambiguous. The court relies on its determination that the policy is ambiguous because there wasn't a provision in the policy to rescind the cancellation. Your Honor, we have many, many cases that stand for the proposition that the trial court can't add provisions that are not in the policy. The second point I want to make is the real danger in relying on that April 1, 1998 facsimile is it doesn't state the date of reinstatement of the coverage. Certainly, Mr. Rouse testified that, I forget his words, undoubtedly or something to that effect. Undoubtedly that it covered from November 13th, the date of the request for the reinstatement to at least April 1st. Right. But at the same time, he acknowledges, as at the date of his deposition, that he had no present recollection of what he really meant when he sent that thing out on April 1st. Without a date where that policy is reinstated, how can we possibly determine whether that liability portion of the CMP policy was in effect on December 17th, the date of the accident? It is just impossible to determine with the kind of certainty that we have on the cancellation request and, as an example, the certainty that we have on the endorsement for the umbrella policy that specifically states we are retroing this back to November 15th. That's the kind of certainty that is required in an insurance policy and that we must have before we can make a determination if coverage is available. Unless the Court has additional questions, I'll take my three minutes at the proper time. All right. Thank you. Thank you. Your Honors, Bob Berrada on behalf of Westfield Insurance and Statewide Insurance. Good morning. I guess we have about five minutes left here. I don't know quite where to start with this case. When I first looked at this case, I couldn't imagine that this was even being litigated. Any responsible company would have lived up to what its agents said. I think this Court, in its questions, has hit the nail right on the head. Aren't they bound by what their agents said? There is no question here that Doug Ross, the Midwest General, was Houston General's agent. Is there any authority for their position that the authority of their agent was limited to those actions outlined in the? Absolutely not. In fact, the opposite is true. Not only, let's take a look back. There were two sources of authority. One is this agency company agreement, which was the express authority in a contract between Houston General and its agent. The insured had no idea what that said or didn't say. What the insured knew was that in Illinois, if it wanted to do anything with Houston General, it had to go through their agent. There was no means to contact Houston General but through its agent. Cases that we've cited on apparent authority show that they, that Houston General had cloaked Midwest General with all the authority that it needed to deal in its entirety with all of these policies and didn't give any indication that there was any limit on those authorities, on that authority. And certainly the agent himself didn't draw that conclusion based on his response to the November 13th letter. I mean, he didn't take it, well, I don't have authority to do this. Of course not. He was presented many times. We've only shown three. There was a telephone call and then a written follow-up and then, of course, the April memo from him. In all of those indications, he's saying, yes, you know, policy is in place. Don't worry about it. The agent is saying, I'm collecting premiums on these things and writing certificates. Make sure that this policy is in place. Don't worry about it. It's in place. Finally, although he had said that orally on numerous occasions, he puts that in writing. And they, and as counsel says, there's some sort of question of fact there. There's no question of fact. I mean, that's, I believe Justice Lankin said his testimony was that undoubtedly what he meant in that April 1st was that from the inception of the policy through April 1st, this policy was in effect. That's summary judgment. That's what was found here. Two courts, sorry, two judges separately found not only was there no question of fact there, but that Houston, I'm sorry, the plaintiffs were entitled to 155 fees because this, quite frankly, was a ridiculous case. To get back a little bit about what counsel is relying on in the air safety in the Eichen Green case, when he's talking about extrinsic evidence or parole evidence or four corners, all those cases deal with an integration clause in a contract that says all prior negotiations are integrated into this. It says nothing about post-contractual written agreements of the parties, which is exactly what we have here. And, of course, contract law says you can amend the contract after it's been executed. And that's, but we're not saying it was amended. We're saying it was never canceled. But that just shows the inapplicability of the air safety in the contract. And one of the indications in the brief was, well, if you were going to do something with regard to the contract, with regard to the policy, the policy says the only thing that can be done is through endorsement. But where is the endorsement that canceled this policy? There is none. What they are relying upon is solely that 11-10, November 10, 1997 request for cancellation. There's no endorsement that cancels the policy. So I just, in our brief, and obviously before the trial court and having to relearn this, there are so many ways in which this case should never have come before the trial court. And the Houston General should have stood up and said, we are bound by our agent, as the Zanini court found, and we're going to live up to that. Our agent said, you had coverage, and by golly, we're going to give you coverage. It's interesting, under the scenario painted by Houston General, it says nothing can be done outside the policy. Nothing can be considered outside the policy. Well, if you take that to its logical conclusion, Houston General could send out a letter to all of its insureds saying, please provide notice of any claims to XYZ Company. And when all of its insureds did that, they could come back and say, oh, no, the policy said you were supposed to do this. Of course, that's not the law. And of course, these are very simple concepts, whether it's a stopple, you now are stopped from saying there is no coverage when your agent said there is, whether it's the Zanini case that says you are bound by the words of your agent. To take a couple of minutes, unless Your Honors have any other questions, on our cross-appeal. Now, that's where I do have questions. Okay. Because I'm not sure. Your position is that there was a detendering to Westfield. Yes. And it appears that you're relying on, although I'm not sure, on the settlement agreement. In our court, yes, we are. But in fact, the trial judge in denying the summary judgment, he, I think it was Judge Quinn, went to September 17, 2001 letter. And I'm curious about why you think that a detendering can occur in the course of settling a case. I mean, doesn't detendering have to occur before substantive matters get resolved? I mean, doesn't that make sense? Well, let me first say what is important in the detendering is the intent of the insurer. Here the intent was clear. Whether it's from the prior letters that they wanted Houston General to be exclusively responsible for defending. Let's go from Houston General to, let's go from Joseph to Houston General on that point right there. What correspondence are you relying on regarding statewide? There are two prior items of correspondence where Joseph told Houston General that it was his intent to cover it exclusively, use that term exclusively. And the date of that? Do you remember? Is that September 17, 2001? No. There were a, there was a March 25, 2003 letter where Joseph's letter to Houston General demanded that Houston General defend and indemnify Joseph exclusively. There was a March 27, 2003 letter where, again, Joseph's letter to Houston General said, quote, defend and indemnify Joseph Construction Company exclusively, unquote. Well, the reason I bring up that date is because on A7, A-7, in Judge Quinn's order, he dated August 31, 2006. He makes reference to that very, that September 17, 2001 correspondence from Joseph to Houston General indicating that it was the sole insurer to defend it. And yet, that's in regards to statewide involvement, and Judge Quinn points out that a virtually identical letter that same day requesting a defense from Westfield, which means that it's covering all bases, and the same letter goes out to both. And let me just say, case law is clear in Illinois that you can deactivate a tenant. There was no question here that initially Westfield was asked to participate, but it also asked Houston General. The subsequent letters to Houston General said, we want you to do it exclusively. Okay, but the exclusive language, I think, well, in the September 17, you don't use, Joseph doesn't use exclusive. It uses sole. So to the extent that these identical letters go out with an identical language that might be the equivalent of exclusive, go to both insurers, I don't understand why you think that the use of exclusive down the line can be interpreted as differently than what the September 17, 2001 letter was interpreted by Judge Quinn. I've got a couple of responses to that. One is, as you asked at the beginning, do we rely on the settlement agreement? And in part, we do. The settlement agreement is post-Docker. Well, in Richard Marker Associates v. Pekins, that case allowed after settlement there to be a detender in the appellate court, so that was perfectly appropriate. Can you give me the cite on that one? The citation of that case is 318 Illinois Appellate 3rd, 1137. The citation is at 1143, carrying over to 1144. It's the second district case, 2001. Okay. And so not only do we believe we had a detender before settlement, we certainly at the time of settlement, there was a detender and a clear expression of what Joseph wanted, Westfield wanted, Statewide wanted. All of them signed to that agreement. And, you know I think you've addressed the Okay. I just have one more point to add. If you don't rule in that fashion, what you've done is rewarded Houston General for not stepping up to the plate. Well, then in fact, that's exactly my next point. Because the judge said, the only way you reward Houston General is if you can force Houston General to take the place of both Statewide and Westfield. And the judge said, Westfield stands on its own. And this is the part where I don't understand why you think Houston General should stand in for Westfield when Westfield is the insurer of R.C. Plumbing, and R.C. Plumbing has a direct liability in this case. And to that extent, why can the general contractor pick and choose among his subcontractors to impose liability when liability should be independent of the discretion of the contractor? It should fall on where did the cause of action occur, who's responsible party? And in this case, R.C. Plumbing certainly is one of those. And that's why the judge said, there's no damage here, because there would have been a settlement between Houston General and Westfield instead of Statewide and Westfield. I think I've got a lot to answer there. I think you've got an easy answer. The easy answer is, in the settlement funding agreement, R.C. Plumbing was allocated $50,000. Okay? So that means Westfield paid $815,000 to settle the liability of Joseph when Joseph had asked for Houston General to be the sole indemnitore of its policy. What does that mean in terms of how much Houston General would have to pay? That means that Houston General would have to pay that $815,000 that Westfield paid on behalf of its additional insured, Joseph Construction. How did you get from Houston General to Westfield? Joseph Construction was insured, had a policy that was under Statewide. I know that. Joseph Construction was an additional insured under Westfield policy and under the Houston General policy. It could then, Joseph, of all three policies, could selectively tender to either one of those carriers. Let me ask you this. Could Joseph have picked any subcontractor that was doing business for it? And the theory behind the selective tender rule is that you negotiate that in your contract. If there is a provision in your contract that says, if I suffer damages because of your activity, you are going to cover me under your insurance. And that's the key. And if your activity here was attributable to R.C. Plumbing, R.C. Plumbing would have to play a role in the settlement or its insured, which is Westfield. And I don't disagree with that except that the role under the agreement is that R.C. Plumbing was liable for $50,000. So, yes, I don't say that Houston General should pick up that $50,000. What I do say is that Houston General should pick up the remaining $815,000 that was allocated to Joseph. And if you go back, if Houston General had done what it should have done, which is accept the tender of this, defend and indemnify Joseph. Let me stop you right there. Are there cases out there where the general contract has, in fact, two insureds, because these guys might be equally culpable for the underlying injury? And so both of them have to defend the general contract. Are there cases like that? I cannot cite one to you. You don't think there are? I simply don't know whether there are or not. And that's where I'm going. Do you understand that? That is the selective tender rule. Well, no, but the selective tender rule is when there are two equally culpable parties. And we don't know whether these are equally culpable parties. I mean, these are, the selective tender rule is where the insured has coverage under two policies that provide for coverage for the same occurrence. Here, we're not talking about the same occurrence because we could have an occurrence under Westfield, under its policy, or you could have an occurrence under a statewide. And those might be two different kind of occurrences. Well, I mean, I respectfully state it's the same occurrence. There may be multiple coverage. But to kind of get back to what I was saying is if Houston General had done what it was supposed to, it would have defended Joseph Construction Company and would have paid the settlement that was allocable to Joseph Construction Company. And that settlement was $1.68 million minus $50,000. And then, but there's a problem that arises from there because there was some discussion about how the umbrella policy was not triggered, and yet Houston General only has a policy limitation of $1 million. So where does the other, well, here, I'm not going to get into that because we did have that in the summary judgment. We have not appealed that. We think, we may not agree with it, that there may be horizontal exhaustion here. But what then would have happened if there is horizontal exhaustion amongst the policies is that Houston General would have paid up to its policy limits, which is the million dollars, and then it would have been shared. There would have been additional damages that would have been allocated to Houston General. So if you were to rule in our favor and overturn the trial court, we would then be entitled up to the limits of that liability. All right. We'll give you a couple minutes. Thank you, Judge. Although I'm not sure it would be necessary. We'll see. Justice Sisson. The point I would like to make, it really is not part of the argument, but it is an observation. This exercise is not intended to punish Houston General. Now, whether I believe that it was imprudent not to file the Beck action in September 17th when this was hit, that's irrelevant. This exercise is not to punish Houston General. There are other means should the court determine there's coverage. On the issue of agency, we know from the agency agreement that there is no authority to rescind the cancellation. There is no authority to reinstate vested in Midwest. The only thing left is apparent authority. Unfortunately, Justices, there is nothing in the evidence that describes the conduct of Houston General that creates this apparent authority. Apparent authority cannot be defined or announced without something to support it. There has to be some conduct. There is none in the record. What of their position that the only way to get to Houston General is going through your agent? I mean, why doesn't that at least trigger some apparent authority? Except that we are talking about a Mr. Marcos now. I guess you would call him a broker for the insured Triton. He's a very, very experienced insurance professional. I am concerned with Mr. Marcos relying on Mr. Rouse's April 4 representation, given his understanding of the insurance industry. So the point I would like to make is where is the reasonable reliance on that representation? I am extremely concerned about a professional who should understand how these policies work and has dealt with Houston General for a number of years, should have understood what was required. I believe that answers your question. I hope it does, but that is my concern. And we also, I think we're losing sight of the focus. The question is not what was the intention of Mr. Marcos and Mr. Rouse. What we need to divine is the intention of Dryden and Houston General. If we look just to the policy documents as the Supreme Court requires, we're looking at the cancellation notice that was signed by the owner and, of course, Houston General's institution of the audit. If we're going to consider extrinsic evidence to determine what Dryden's intent was, we have to also, and we're incumbent in a motion for summary judgment, to consider the testimony of Mr. and Mrs. Holquin. Mrs. Holquin didn't recall having coverage. She requested the coverage be terminated. Mr. Holquin was the field manager for that company. He clearly testified, look, after November, we stopped working. We did not do anything. And in the motion for summary judgment, the court is permitted to draw reasonable inferences. The reasonable inference is why would a company whose doors are shut, doing no business, require an occurrence policy, which is essentially what the liability portion of the policy was. Was this on the record that they worked up until some loose things up until May of 1998? They had to have, in fact, because they had to have gone beyond the ‑‑ it had to have been working on December 17th because that's the employee at Dryden. Actually, Mr. Holquin specifically testified that after November of 97, they stopped working. Well, how did an employee of Dryden get injured on December 17th? Your Honor, I think that is a mistake in my opponent's brief. If, in fact, that was true, we'd either not be here or we'd be discussing other issues because if it was a ‑‑ I wonder how that happened. But anyway, I think you've made clear it. I think you've got ‑‑ you're at your limit there on three minutes, but go ahead. Just a couple more. A couple more, quickly. In terms of ‑‑ Don't rely on the facts. Just give us your answer. The reliance point, I think, is well stated. In terms of why we didn't issue an endorsement when the policy was canceled is we have to bear in mind that two different sections of the common policy conditions are triggered. When the insurer cancels, it's under the one section that simply requires the notice with great certain. It does not require the Houston General to provide an endorsement. So part B, when the parties or the insurer wants to amend the policy, that's where Houston General must agree and then send an endorsement. We're talking two different sections of the policy here. So there is no endorsement required when the insurer cancels the policy. But technically speaking, there is no amendment to the policy when it's simply just reinstating it because the policy doesn't change. That's what the judge said. Well, I respectfully disagree with the trial judge because the policy period is such a fundamental term and condition of an insurance policy that to change that is changing the coverage because you are changing the termination dates. This case is a perfect example of why that's important. Well, if that's the case, though, I think it goes back to counsel's point, maybe a slight modification is that where's the endorsement for the change of the policy date or the termination date? Yeah, because... Technically the cancellation, but why not require an endorsement on that? Because the agreement between Dryden and Houston General says if the insurer wishes to cancel before the end of the policy, here's all that is required. You've got to give us written notice. You've got to give us the date served. It does not require in that section that Houston General acquiesce to the termination, nor does it require that an endorsement be tendered to make that effective. That's the significant difference. In terms of the concurrent obligation, I think, again, we have to focus. It's not on what Joseph told Houston General that's important. It has absolutely no bearing on whether Joseph detenders to Westfield. Westfield had an obligation under Illinois law to defend Joseph as an additional insurer until Joseph specifically detendered to Westfield. Joseph can say anything he wants to Houston General. That doesn't detender Westfield's obligation. Can they detender in the settlement agreement? They can detender after the settlement agreement, Your Honor, but that didn't happen. Okay. That did not happen. Again, the settlement agreement was resolving in large part a deck action. If the responsibility for covering Joseph had been detendered, why are you settling a deck action? Why are you even involved in a deck action? It's a moot point. I think, again, the evidence is clear. I will now do what all attorneys should do is close your mouth and grasp the chair, but not before I wish to thank you on behalf of my client for your kind consideration of his appeal. To recap, what we're looking for is obviously we would like to have a reversal and entry of judgment. At minimum, we believe that there's material issues of fact that require being remanded for further proceedings in the trial court, and failing all of that, we request the court consider our arguments on the other issues and the relief that we request for those arguments. Again, thank you very much. Thank you. Mr. Barrett, I have a question regarding the Section 155 attorney fees. It strikes me, and this is just, you know, an initial thought, that there appears to be a double penalty in this case to impose Section 155 attorney fees for basically the same conduct that bars Houston General from asserting any kind of defense or policy defenses, so that you're sort of double penalizing him, and it leaves me to some concern, because there are oftentimes suits filed between insurance companies to force it, and it seems here that there was really only two times when Joseph tendered to Houston General, and does two times make it vexatious? And I understand your signee argument, and it seems like the insurer becomes the insured against the insurer, and that seems like an awfully complicated manner, opening to Section 155 attorney fees, that maybe we don't have to get into. I don't fully understand the double penalty, but let me just say, cases are clear here, and as you started out this argument, that when presented with this, the insurance company should have filed a deck action. They didn't do that. That's the way things should proceed, and that's the way the appellate courts and the Supreme Court have said over and over again. Okay, but let me ask you this. Let's say in the absence of filing a deck action, what other cases there where an insurance company gets a Section 155 attorney fees? Well, we've cited them mostly in the context of not filing a deck action, but also when it's unreasonable or vexatious. And so I would say it's twofold in this case, and both trial judges found that. Not only did they not follow the tried and true path here, but the other instance is your own agent said there was coverage, and the second time this was tendered to you, that writing was put before you, and you said, we're not going to do anything. It sat on its hands. Now, the fees are to be to make the insured or its assignee whole. If you don't put fees here, then what's an insured, what's an insurance company to do? They'll never make it. They'll never cover. Isn't that always true? But there should be. I will tell you, although I am representing an insurance company here, yes, they often don't do what they should, but that's why the law provides a remedy, and that remedy here is for fees. If they, if all they did was sit on their hands, they did not provide coverage when they absolutely should have, even when presented with the rights. They didn't file a DAC action. They didn't do a reservation of rights. This case screams out for fees, as both trial judges found, because if you don't do it here, then by golly, when are you going to do it? And insurance companies will always sit on their hands because, you know what, maybe they don't see us. Let me turn that around a little bit. If you do do it here, are we going to get all these actions seeking Section 155 attorney fees from between insurance company to insurance company? Absolutely not. You know, that is within the discretion of the trial judge. Well, no, I'm talking about the request. I'm not talking about the granting. But, again, you know, the Section 155 fees are not only to make the insured or its assignee whole, but to punish the insurance company. And what it did here was sit on its hands when it absolutely should not have done it. And regarding the double penalty, I'm saying that the Illinois law already punishes such insurance companies by barring them from asserting any policy defenses that they would otherwise have had available to them. But, again, Your Honor, here it is even more so than that. We have not just the barring, which didn't even come into play in our case. They may have no defenses. Okay, so that may not be a penalty at all. Here it was no penalty to them whatsoever. So, in that case, you know, why would an insurance company step up to the plate when, well, maybe all you have to do is defend a lawsuit, and all you're going to have to pay is, well, maybe your allocable share. I just want to make one point, if I may, and I know it's been a long morning, and I apologize for that. Here, Houston General Counsel acknowledged the fact that there can be a detender after the settlement. And I would just direct Your Honor's attention to paragraph 7 of the settlement funding agreement that says, for the purposes of the McCartan suit, it is the express desire of Joseph Construction Company that the entire cost of any settlement be borne by Houston General Insurance Company. Any payments made by Westfield and Statewide, as set forth herein, will be made only because Houston General has breached its obligations to Joseph under its policy of insurance, of which Joseph is an additional insurer. That agreement was signed by Westfield, by Joseph, and by Statewide. All right, let's say that satisfies the detendering. It still doesn't address what the circuit court had ruled, and it ruled that there was a concurrent duty on behalf of Westfield and Statewide to represent Joseph. Are you saying that concurrent duties cannot exist in the context of this case? There was a concurrent duty up until the time there was a detender. And, yes, at the time that they sent out those letters in 2001, there was a concurrent duty. Until they detendered, there was a duty. That goes to duty to defend. I'm talking about duty to indemnify. And that's the question because the detendering doesn't answer the indemnification question, it only answers the duty to defend question. The detender is who's going to provide coverage. Are you tendering this for coverage, whether it's duty to defend or duty to indemnify? And that settlement agreement could not be more clear. The money that they were paying out under that settlement agreement should have gone, and it was their intent, it should be paid by Houston General. Then one last question. Are you saying that the circuit court reached out and answered a question that it really shouldn't have answered at all, that, in fact, there was a concurrent duty on the part of Westfield to defend Joseph? Yes. Okay. And also what I am saying is I don't think the – there were two opinions. Judge Quinn, in his first opinion, raised the issue. He did not decide the issue. Then we had a new judge, Judge Pantley, who came in, who said, well, I'm looking at this and this is really kind of what Quinn meant. There was not really kind of the in-depth analysis that we've done in the circuit. All right. Good to know. I want to thank both of you, and good luck.